IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 6, 2013 Session

### IN RE ESTATE OF HAZEL N. LEDFORD

**Appeal from the Chancery Court for Bradley County**
**No. P-91-093      Jerri S. Bryant, Chancellor**

**No. E2012-01269-COA-R3-CV-FILED-APRIL 11, 2013**

Hazel N. Ledford died on June 22, 1991. Her will ("the Will") was a joint holographic one made with her husband, Wilson A. Ledford, who predeceased her. Her stepdaughter, Martha Ledford Powell, became the sole personal representative ("the Personal Representative") and executor of her stepmother's estate ("the Estate"). The Will was admitted to probate in July 1991, but the Personal Representative did not file her first accounting until 2009. The final accounting was filed in February 2010. The final accounting revealed that the Estate had paid approximately $350,000 toward remediation of soil contamination caused by underground petroleum storage tanks ("the USTs") on a parcel of land Mr. Ledford conveyed before his death to a family trust. While Mrs. Ledford was never a title owner of the property, she did join in the execution of the deed to the trust. The Will left a portion of Mrs. Ledford's residuary estate to a charitable trust. The charitable trust and the Tennessee Attorney General[1] (sometimes referred to collectively as "the Objectors") objected to the final accounting on the ground that the remediation payments were not a proper expense of the Estate. The court denied the objections and approved the final accounting. The court also approved, in part, the Personal Representative's request for attorney's fees. The Objectors appeal. We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, J., and NORMA MCGEE OGLE, SP.J., joined.

---

[1]Tenn. Code Ann. § 35-15-110(b)(2007) gives "[t]he attorney general of this state . . . the rights of a qualified beneficiary with respect to a charitable trust having its principal place of administration in this state."

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; and Janet M. Kleinfelter, Deputy Attorney General, Public Interest Division, Nashville, Tennessee, for the appellant, Robert E. Cooper, Jr., Attorney General and Reporter.

Marcia M. McMurray, Cleveland, Tennessee, for the appellant, Bradley Healthcare and Rehabilitation Center Citizens' Endowment Fund.

Joshua H. Jenne, Cleveland, Tennessee, for the appellee, Estate of Hazel N. Ledford.

**OPINION**

I.

Hazel N. Ledford was Wilson A. Ledford's second wife. The record supplies only a clue as to when they married. They were married as of December 25, 1981, the date upon which they executed a trust agreement creating the Ledford Family Trust. In basic terms, the document sets aside some of Mr. Ledford's property to be known as the "Family Trust Property," for the benefit of Mr. Ledford's children and grandchildren. The Family Trust Property was to be maintained as income-producing property until such time as the youngest grandchild reached the age of 25, at which time the trust would terminate and anything left in the trust would be divided among the beneficiaries. As each grandchild reached the age of 25, a portion of the corpus would be distributed to that grandchild. Also, income from the Family Trust Property was to be distributed in nine equal shares among Wilson A. Ledford's three children and his six grandchildren.

The Family Trust Property was transferred to the three children of Wilson A. Ledford as trustees of the Ledford Family Trust by deed dated January 1, 1982, signed by Wilson A. Ledford and Hazel N. Ledford as "wife" of Wilson A. Ledford. The deed describes two parcels. Parcel one is "the same real estate conveyed to Wilson A. Ledford by Samuel Kibler, et al., trustees . . . ." Parcel two is "the same real estate conveyed to Wilson A. Ledford by H. E. Hawk and wife, Katie Bell Hawk . . . ." There is no indication in the record that Wilson A. Ledford ever conveyed an interest in either of the two parcels to Mrs. Ledford.

It was upon the Family Trust Property that soil contamination from the USTs was later found. The USTs were present because Wilson A. Ledford operated a "filling station" on one or both of the parcels until approximately 1970. Contrary to the trial court's statement in its opinion, *i.e.*, that "both [Wilson and Hazel N. Ledford] operated a gas station until 1972," there is no evidence in the record that Hazel N. Ledford ever had a role in the

operation of the gas station.[2] We have scoured the record and have been unable to find in any of the filings or in an announcement to the court any stipulation such as the one referenced in the court's opinion as follows: "It is stipulated between the parties the last persons to operate the gas station and utilize [the USTs] were the testators themselves."

In September 1984, Wilson and Hazel Ledford gave the Bradley County Memorial Hospital ("the Hospital") $10,000 to be used for indigent care. This gift was the impetus for establishment by the Hospital of a trust fund called the Bradley Memorial Hospital Citizens' Endowment Fund ("the Fund"). The Fund is established through a "Declaration of Trust" ("the Declaration") that designates the trustees of the Hospital as the trustees also of the Fund. The Declaration further provides that "the Trustees shall act by vote of a majority of their number" and "[a]ny instrument executed in connection with this Trust shall be valid if executed in the name of this trust by a majority of the Trustees." If the Hospital ceases to operate "as a public instrumentality of Bradley County" the corpus of the Fund is to be paid over to "the Bradley County Nursing Home Citizens' Endowment Fund" provided a trust is formed to administer the fund under a declaration of trust "substantially identical" to the Declaration. That contingency has happened and the party in interest in this case is Bradley Healthcare & Rehabilitation Center Citizens' Endowment Fund ("the Rehabilitation Fund").

Because of concerns by Wilson A. Ledford, as a benefactor and as a trustee of the Hospital, that the Fund was not being used for its intended purpose, the Hospital established the Bradley Healthcare Foundation ('the Foundation"). This happened about two years after the Declaration. The Foundation was established to administer the payment of the earnings of the Fund for the benefit of indigent patients. There were many members of the board of trustees of the Foundation. There was at least one member of the board of trustees of the Hospital on the Foundation's board of trustees. The Foundation was, for the most part, governed by its executive committee which consisted of about ten to twelve of the Foundation trustees. Jim Whitlock, administrator of the Hospital, was president of the Foundation and part of the executive committee. The Foundation employed its own administrator.

On November 30, 1989, the Ledfords executed the Will. The Will leaves the entire estate, after payment of just debts, to the surviving spouse. Upon the death of the surviving spouse, specific payments are directed, after which the balance of anything valuable is to be liquidated and invested in "insured accounts" "in a new Wilson A. and Hazel N. Ledford Trust." ("the Testamentary Trust"). The basic terms of the Testamentary Trust are that the earnings are to be distributed to the children and grandchildren of Mr. Ledford according to set percentages, and, at the death of any child or grandchild, "the percentage of the

---

[2]*See* footnote 4.

[Testamentary Trust] they are receiving earnings from be given to [the Fund]." At the death of the last living child or grandchild, the Fund receives the balance of the corpus of the Testamentary Trust and the Testamentary Trust terminates.

Wilson A. Ledford died on or about May 10, 1990. The original of the Will was filed in the Bradley County probate court under docket number P-90-122. That was the only action taken with regard to Mr. Ledford's estate.

As we have previously stated, Mrs. Ledford died on June 22, 1991. Sometime before she died, the Personal Representative and the other trustees of the Ledford Family Trust received notice that the USTs on the property now owned by the Ledford Family Trust might be an environmental concern. They removed some of the USTs and learned that others were situated under a building on the Family Trust Property. The trustees of the Ledford Family Trust ordered testing done before Mrs. Ledford died but did not receive the results back until after her death. The tests revealed contamination from the USTs under the building. Hence, remediation was required.

The Personal Representative along with her brother filed the petition regarding "Probate of the Last Will and Testament of Hazel N. Ledford." They estimated the value of the estate at $470,000 consisting of $130,000 real property and $340,000 personal property. The Fund was specifically identified in the petition as a legatee and devisee under the Will. The brother later resigned, leaving the Personal Representative as the sole representative and executor. Statutory notice to the creditors of the "Estate of Hazel N. Ledford (Deceased)" was published on July 3, and 10, 1991. The record contains no evidence of any claims being filed against the Estate.

The trustees of the Ledford Family Trust soon learned that the USTs under the building were a substantial liability and that significant expenditures would be needed to remediate the problem. As it turned out, the expenditures were in the neighborhood of $350,000[3].

The Personal Representative and her siblings, as trustees of the Ledford Family Trust, called a meeting of the beneficiaries under the Will. The Personal Representative would later testify that she attended on behalf of the Estate, and her two siblings attended on behalf of the Ledford Family Trust. The only other person present was Jim Whitlock, the administrator of the Hospital. During the course of the meeting, an agreement was reached that the Estate would be responsible for the cost of remediation. A trustee of the Hospital later testified that the trustees of the Hospital did not authorize Whitlock to make an

---

[3]The exact figure, according to a finding by the clerk and master, is $345,720.

agreement on behalf of the Hospital, although Whitlock was expected to and did often act on behalf of the Hospital and sign contracts on behalf of the Hospital. The trustees also expected Whitlock to take care of the business of the Fund. The same trustee referred to above, who was chairman of the Hospital's board of trustees for approximately 20 years, testified that to his knowledge the trustees of the Fund never held a meeting and did not authorize Whitlock to act on behalf of the Fund. In fact, the witness did not even know of the alleged agreement between the Estate and the Ledford Family Trust or its alleged approval by Whitlock as administrator of the Hospital. The same trustee testified that Whitlock was never a member of the board of trustees of the Hospital or the Fund, although he was on the executive committee of the Foundation.

After the meeting, the Personal Representative asked an attorney to draft a document reflecting the agreement reached at the meeting. Attorney Frederick Hitchcock drafted the document and provided it to the Personal Representative under cover of a letter explaining the basis for shifting liability for remediation away from the Ledford Family Trust to "the Estate of Wilson A. Ledford." The key was that liability is based on ownership of the tanks and "the tanks were last used prior to 1974, when Mr. Ledford owned the property." Further, the USTs "have never been operated by the Trust or by anyone else during the period of the Trust's ownership of the property." The letter further states: "Because your father was the last person to own the underground storage tanks prior to November 8, 1984, Mr. Ledford would meet the definition of 'owner' . . . and his Estate should be liable for such costs."

On or about July 31, 1992, an agreement was executed "by and between the Estates of Wilson A. Ledford and Hazel N. Ledford (["the combined Estates"]) and the Ledford Family Trust (the 'Trust'), and Bradley Memorial County Hospital" as well as the family beneficiaries of the Will. The recitals in the agreement include the following:

> Wilson A. Ledford and Hazel N. Ledford . . . owned and operated,[4] for a period of time ending in 1972, . . . [the USTs] in the . . . [Trust Property].

> \* \* \*

---

[4]We do not view this recital as evidence that Mrs. Ledford had any role in the ownership or operation of the gas station. As beneficiaries of the Ledford Family Trust, the recital is self-serving on the part of all the Ledford children and grandchildren, including the Personal Representative. At trial, no testimony was offered concerning Mrs. Ledford's involvement in the station.

Mr. Ledford died on May 10, 1990, and Mrs. Ledford died on June 22, 1991, and their estates are currently being administered pursuant to [the Will] . . . .

\* \* \*

The Estate and the Trust desire to allocate the expenses and liabilities associated with the USTs in a manner consistent with the law.

Beneficiaries above named join in the execution of this document for purposes of signifying their consent.

(Paragraph numbering omitted; footnote added.) In the body of the agreement, the combined Estates acknowledge ownership of the USTs and liability for remediation including holding the Ledford Family Trust harmless from any expenses associated with the USTs. The Personal Representative executed the agreement on behalf of the "Estates of Wilson A. Ledford and Hazel N. Ledford;" she and her two siblings executed the agreement as trustees of the Ledford Family Trust; and all the Ledford children and grandchildren executed the agreement as beneficiaries. Whitlock executed the document as a beneficiary by "Bradley Memorial Hospital Administrator."

As we have indicated, the Personal Representative paid out approximately $350,000 by the time she received approval of the remediation efforts by the agency in charge. By letter dated September 8, 2005, the Estate notified the Hospital that the value of the Estate, after the remediation expenditures, was approximately $110,000. The Estate proposed to the Hospital that it accept the sum of $30,937.69 as the present value of the remainder interest of the Fund in the Estate. By letter from its attorney dated September 13, 2005, the Hospital purported to accept the Estate's offer. The attorney later testified that he did not represent the Fund or the Rehabilitation Fund. Part of the impetus for the settlement was the imminent sale of the Hospital to a private interest. The money, therefore, went to the Rehabilitation Fund.

The Personal Representative next filed her interim accounting and then her final accounting. The Rehabilitation Fund and the Attorney General objected. The matter of the accounting was considered by the clerk and master. The clerk and master filed a report which accepted the accounting but noted that acceptance or rejection hinged largely upon the legality of the purported agreement of the combined Estates to accept liability for remediation. The clerk and master noted that if the Estate was not liable for the remediation,

its evaluation of the accounting would change "drastically." The Rehabilitation Fund and the Attorney General objected to the clerk and master's report accepting the accounting.

The court held a hearing, de novo, on the accounting on November 18, 2010, and took the matter under advisement. In its order entered February 28, 2011, the court stated, in pertinent part:

> It is for the court to resolve whether the Personal Representative properly paid the cost of remediation on this property. According to the statute, it appears that remediation costs would have been properly payable by the owner of the tanks at the time they were last used. Until the costs of remediation were fully paid and the release letter obtained from the State of Tennessee, the amount of money available for the funding of the residuary trust was undetermined. As such, until the court determined whether or not the estate properly paid the cost of remediation, this matter was not ripe for final administration. The court finds that because of the way the [Fund] . . . and [the Hospital] used identical boards, a reasonable person (the Personal Representative) could rely on the apparent authority of Mr. Whitlock to bind either or both boards. While the Personal Representative did not have statutory authority to remediate the gas station property without incorporation under the [W]ill of the powers of the fiduciary under T.C.A. § 35-50-110, nor did the Personal Representative have authority to bind the estate to the cost of remediation without court approval, the Personal Representative did receive the approval of all the beneficiaries of the estate with the exception of the residuary beneficiary, the . . . Fund. There is no proof in the record that the Fund's consent was ever obtained. However, the court finds the Personal Representative credible and to have acted in good faith.
>
> The court finds that the State of Tennessee on behalf of the . . . Fund has not shown the Ledford Estate would not have been liable for the cleanup of the underground storage tanks. They have not proven the Personal Representative acted in bad faith. Instead, they argue that the Personal Representative had no legal authority to consent to the agreement. While this may have been true, she acted upon the apparent authority of Jim Whitlock to handle this matter in this fashion.

-7-

As an additional issue, the Personal Representative paid partial attorneys' fees in this estate. There has not been any proof at this point in time that the attorneys' fees have been paid in furtherance of the estate issues or that the attorneys' fees were necessary for preservation of the estate. Therefore, this court will allow the Personal Representative's attorneys an opportunity to file an Affidavit concerning their attorneys' fees, breaking down into time and subject matter so that the court can come to a reasonable conclusion as to what amount of attorneys' fees are properly payable by the Personal Representative from the estate. Any attorneys' fees not found to be properly payable from the estate must be reimbursed by the Personal Representative. . . .

All attorneys' fees paid with reference to the lawsuit in Docket #07-244 [seeking termination of the Charitable Trust] must be repaid to the estate and are not properly chargeable against the estate.

Thereafter, the Personal Representative asked for approval of attorney's fees in the amount of $11,076.53 for the work done by Mr. Hitchcock and $18,656.25 for the work done by Mr. Jenne's firm. The parties agreed to waive an evidentiary hearing. Eventually, the court approved fees in the amount of $11,076.53 for Mr. Hitchcock. As to the fees charged by attorney Jenne, the court held that the claim for fees incurred prior to the final accounting was limited to "$6,084.75 through the period of the Final Accounting." The court allowed the fees claimed after the final accounting for defending the Personal Representative's actions, although it did not state a sum certain for the fees of Mr. Jenne that it was allowing.

II.

The issues raised by the Objectors are:

Whether the trial court erred in approving amounts paid by the Personal Representative out of assets of the Estate for remediation of property not owned by the Estate.

Whether the trial court erred in approving certain attorneys' fees paid by the Personal Representative out of assets of the Estate.

-8-

The Estate raises the question of whether it should be "entitled to attorney fees for defending the appeal."

III.

A court's factual findings after a bench trial are reviewed de novo, with a presumption they are correct unless the evidence preponderates against the court's findings. Tenn. R. App. P. 13(d); **Cross v. City of Memphis**, 20 S.W.3d 642, 645 (Tenn. 2000). The court's legal conclusions are reviewed de novo without a presumption of correctness. **Nelson v. Wal Mart Stores, Inc.**, 8 S.W.3d 625, 628 (Tenn. 1999). A trial court's ruling for reimbursement of attorney's fees out of an estate is reviewed under an abuse of discretion standard. **Merchants & Planters Bank v. Myers**, 644 S.W.2d 683, 688 (Tenn. Ct. App. 1982). The abuse of discretion standard is a relaxed standard, but it "does not . . . immunize a lower court's decision from any meaningful appellate scrutiny."

As the Supreme Court stated in **Lee Medical, Inc. v. Beecher**, 312 S.W.3d 515, 524 (Tenn. 2010):

> Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.
>
> To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions.

IV.

The Objectors assert that the trial court erred when it relied upon Mr. Whitlock's agreement to allow the Estate to assume responsibility for remediation expenditures in overruling their objection to those expenditures. We agree that there are both legal and factual errors in the court's analysis. The court correctly found that Whitlock did not have actual authority to bind either the Hospital or the Fund. The court's determination that Whitlock's actions somehow bound the Fund was based on apparent authority. The court's finding was based, at least in part, on the belief that there was "proof . . . that Mr. Whitlock was not only on the Hospital Board of Trustees and the Citizens' Endowment Fund Board of Trustees, but also on the Executive Committee of a third board, the Bradley Healthcare Foundation." Our review of the record reveals that Whitlock was never a trustee of the Hospital or the Fund. He was on the Executive Committee and the board of trustees for the Foundation. The Foundation's responsibility and authority was limited to making sure the earnings of the Fund were spent, as they were earned, on indigent care.

Further, Whitlock's signature on the document which purported to memorialize the agreement could not have led anyone to believe he was authorized to act on behalf of the Fund – he signed as the "administrator" of the Hospital, and not as a representative of the Fund. It is undisputed that the Fund and the Hospital are separate entities. Furthermore, nothing that Whitlock did as an agent could have clothed him with apparent authority to act for the Fund. As the Supreme Court has stated:

> The apparent power of an agent is to be determined *by the acts of the principal and not by the acts of the agent*; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and *not where the agent's own conduct has created the apparent authority*. The liability of the principal is determined in any particular case, however, not merely by what was the apparent authority of the agent, but by what authority the third person, exercising reasonable care and prudence, was justified in believing that the principal had by his acts under the circumstances conferred upon his agent.

*Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 433 (Tenn. 2008) (emphasis added) (*quoting Southern Ry. Co. v. Pickle*, 138 Tenn. 238, 197 S.W. 675, 677 (1917)). There is simply no proof in this record of anything the Fund did that could reasonably be interpreted

-10-

by the Personal Representative as bestowing authority on Mr. Whitlock to agree to the waiver of the Fund's rights under the Will.

Thus, we conclude that the evidence preponderates against the court's factual findings that Whitlock was a trustee of the Hospital and the Fund. We conclude also that the trial court's findings are erroneously based on the actions of the purported agent rather than those of the principal. We further conclude that even if Whitlock's actions could have given rise to apparent authority, it was the apparent authority of the Hospital only, on whose behalf he purported to act, rather than the Fund.

The Objectors also assert that there was no legal basis for the Estate, or the Personal Representative on behalf of the Estate, to simply assume the responsibility for remediation on property the Estate did not own. Again, we agree with several of the points made by the Objectors. Although neither party addresses the issue directly, the Estate we are dealing with here is the Estate of Hazel N. Ledford. This is not the combined Estates spoken of in the document executed in 1992; there is no such thing. Mr. Ledford died leaving an estate, all of which passed to Mrs. Ledford. She died and this case pertains to her estate. There was no timely claim filed against her estate, and it appears that no claim was filed against her husband's estate. Twelve months after her passing, all claims were forever barred. Tenn. Code Ann. § 30-2-310 (2007). The Ledford Family Trust knew about the contamination problem from the UST's and considered filing a claim against the Estate, but did not. Title to the property upon which the abatement was performed passed to the Ledford Family Trust long before the death of Mrs. Ledford. Further, as we have previously indicated, the proof preponderates against Mrs. Ledford ever holding an actual ownership interest in the Family Trust Property. There is no proof in the record that she was involved in operating the gas station situated on that property. All the proof in the record is to the effect that Mr. Ledford was the operator of the gas station and the sole owner of the Family Trust Property.

Further, even if there had been a claim or a legitimate basis for a claim, the Will did not expressly or, by incorporation of Tenn. Code Ann. § 35-50-110 (2007), give the Personal Representative the power to enter into contracts on behalf of the Estate, settle or compromise claims or demands, or abate environment hazards on property of the Estate. *See*, *id*. (10, 11, and 32). Also, as the trial court found, the Personal Representative did not seek or obtain court approval of the abatement expenditures before they were made. Since there was not an allowable claim against the Estate, or even a colorable basis for one that we can find, the belated court approval of the expenditures of the Estate for the benefit of the Ledford Family Trust cannot stand.

In light of our above holdings, it is also clear that the approval of attorney's fees cannot stand.  As we said in **In re Estate of Wallace**, 829 S.W.2d 696 (Tenn. Ct. App. 1992),

> Executors have the authority to retain counsel to assist them in administering an estate. When they retain counsel, they are personally liable for the fees until a court determines that the services were required and that the fee was reasonable.  If a court approves the fee, the executor may charge it back against the estate as one of the costs of administration under Tenn. Code Ann. § 30-2-606.
>
> In order for attorney's fees to be allowed as an administrative expense, they must be shown to be required, and *the services provided must inure to the benefit of the entire estate, as opposed to one or more of the interested parties*. Thus, in order to use estate funds to pay for the legal fees in this case, we must examine the record to determine whether the services were required and were for the estate's benefit and whether the amount of the requested fee is reasonable.

*Id*. at 703 (emphasis added).

The record in the present case reveals that the fees were all incurred in the process of preparing an agreement that was not authorized by the Will or approved by the court, to pay a claim that was not made, and then defend those actions when challenged.  The services rendered did not benefit the Estate; they were to the benefit of the Ledford Family Trust.

The final issue is the Estate's request that we award attorney's fees for defending the appeal.  The Estate apparently contends the appeal is frivolous.  Obviously, it is not.  We decline the Estate's request for attorney's fees.

V.

The judgment of the trial court is reversed.  Costs on appeal are taxed to the appellee, the estate of Hazel N. Ledford.  This matter is remanded, pursuant to applicable law, to the trial court for further proceedings consistent with this opinion.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE